# Third District Court of Appeal

## State of Florida

Opinion filed February 21, 2018.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D16-1881
Lower Tribunal No. 15-9465
_____

**Liork, LLC and Keren Ben Shimon,**
Appellants,

vs.

**BH 150 Second Avenue, LLC,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Barbara Areces, Judge.

Militzok & Levy, P.A. (Hollywood); Richard J. Lee (Hollywood), for appellants.

Jonathan A. Heller; Jay M. Levy, for appellee.

Before SUAREZ, SCALES and LUCK, JJ.

LUCK, J.

This case is about the enforceability of a subscription agreement between an investor and the company she invested in. The investor sought a declaratory judgment that the subscription agreement she signed was unenforceable because there was a lack of mutuality, and the liquidated damages clause calling for her to surrender her initial payments was an improper penalty provision. The trial court granted the investment company's motion for summary judgment, declaring the agreement was enforceable. We agree, and affirm.

*Factual Background and Procedural History*

In 2013, BH 150 Second Avenue, LLC, made an offering seeking accredited[1] investors to join in a business venture. The objective of the venture was to purchase a commercial building in downtown Miami and convert it into an office and retail condominium of approximately 100 units. The offering was intended as an alternative to obtaining institutional or bank financing for the project. The offering included a proposed operating agreement for the new business and a subscription agreement to be signed by each investor. Prior to making the offering, BH 150 contracted with the owners of the building it sought to purchase. The purchase price was $17.5 million and BH 150 paid a $1.1 million non-refundable deposit on the contract. The subscription agreement to be signed by the investors recited the existence of the contract and anticipated the transaction would close on

---

[1] An accredited investor was defined as an individual with a net worth exceeding $1 million, excluding the individual's primary residence.

or about November 1, 2013, although it allowed for an extension of one hundred twenty days if the renovations being performed were not completed in a timely fashion.

On August 9, 2013, Keren Ben Shimon executed a subscription agreement where she agreed to pay $565,000 at execution, $1,130,000 thirty days after execution, and the remaining $3,955,000 thirty days prior to the noticed closing date on the purchase of the building.[2] Upon completion of the project, Ben Shimon would be deeded title to four of the building's condominium units. Ben Shimon made three payments under the agreement totaling $3,295,000.

On December 2, 2013, BH 150 notified Ben Shimon and the other investors that the closing on the purchase of the building was anticipated to occur on January 15, 2014. Ben Shimon was told that in accordance with the terms of her agreement the final payment of $2,469,154.04 needed to be made on or before December 16, 2013. Ben Shimon was unable to make the payment and asked for additional time. Ben Shimon was advised that another investor was willing to advance Ben Shimon the amount required to avoid default, but Ben Shimon did not accept this loan. BH 150 sent a default letter to Ben Shimon on December 19, 2013. Eventually, the developer of the office building chipped in the money needed to make up for the

---

[2] After she signed the subscription agreement, Ben Shimon assigned her interest in the subscription to her company, Liork, LLC, although she remained responsible for performing under the agreement.

shortfall created by Ben Shimon's default, and BH 150 closed on the purchase of the building on February 28, 2014.

In the wake of the default, Ben Shimon brought this declaratory relief action seeking to: (1) declare the subscription agreement void for lack of mutuality; (2) declare the liquidation damages clause unenforceable as a penalty; and (3) obtain a return of her initial payments BH 150 retained as a result of the default. The parties filed cross-motions for summary judgment, and after a hearing, the trial court denied Ben Shimon's motions and granted BH 150's motions. Ben Shimon appeals from the final summary judgment in favor of BH 150.

*Standard of Review*

Where, as here, based on undisputed facts, the trial court grants one party's cross-motion for summary judgment on a declaratory judgment action, our review is de novo. Lee Cty. Elec. Coop., Inc. v. City of Cape Coral, 159 So. 3d 126, 127 (Fla. 2d DCA 2014) ("In the declaratory judgment proceeding, the City and LCEC filed cross-motions for summary judgment. The circuit court determined that the facts were undisputed, and it ruled in the City's favor based on the franchise agreement between the parties and on section 337.403(1), Florida Statutes (2005). Our review of the summary judgment is de novo.").

*Discussion*

4

Ben Shimon contends the trial court erred in granting summary judgment for BH 150 because (1) the subscription agreement lacked mutuality of obligations; and (2) it had an unenforceable penalty clause. We will address each issue separately.

1. Lack of mutuality.

Ben Shimon claims the subscription agreement is void for lack of mutuality because BH 150 retained two rights which in essence allowed it to perform or not at its sole discretion. The two retained rights are contained in the following language from the subscription agreement:

> Subscriber understands and agrees that this Subscription may be rejected by the Company at any time in its sole discretion. . . . If the Subscription is rejected, all funds received from the Subscriber will be returned, without interest, by the Company, and, thereafter, this Agreement shall be of no further force or effect. Additionally, if the Company accepts the Subscription, but the Company does not purchase the Property for any reason or no reason at all, all funds received from the Subscriber will be returned, without interest, to Subscriber and this Agreement will be of no further force or effect. . . .

Ben Shimon reads this language as authorizing BH 150 to terminate her subscription at any time and, more importantly, to back out from the purchase of the building for any reason, thus rendering its promises under the agreement completely illusory. Ben Shimon correctly argues that a bilateral contract where one party retains the right to fulfill or decline to fulfill its contractual obligation is unenforceable because it is based on an illusory promise. See, e.g., Flagship Resort

5

Dev. Corp. v. Interval Int'l, Inc., 28 So. 3d 915, 921 (Fla. 3d DCA 2010) ("[I]n a bilateral contract a promise that permits the promisor to fulfill or decline to fulfill its contractual obligations at its option is not binding on the promisor and renders the promise incapable of enforcement by the promisee."). This rule, however, applies to bilateral contracts where one party promises to perform a specific action directly in exchange for the other party performing another specific action, like a sale and purchase agreement. That is not the type of agreement at issue in this case.

Ben Shimon entered into an agreement subscribing to a business venture, not a direct purchase and sale agreement to acquire title to certain condominium units. Ben Shimon, a sophisticated investor, was to receive an interest in the venture, after being apprised of the risk factors involved in the business. In fact, in connection with her subscription, Ben Shimon was provided with a document listing twenty-three separate risks associated with the venture, including:

> The Subscriber has been cautioned that an investment in the Company is speculative and involves significant risks, and that it is probably not possible to foresee and describe all of the business, economic and financial risks factors which may affect the Company. The Subscriber acknowledges that he has been advised to seek independent professional advice in order to carefully analyze the risks and merits of an investment in the Company.

Subscriptions capitalized the business venture which entailed acquisition of an office building and remodeling and converting it into a condominium. In lieu of

return of their cash investment and any profit earned by the venture, the investors were to receive title to condominium units.

Like any investor in an uncertain business enterprise, the subscribers assumed the risk that for whatever reason, including the inability to acquire title to the property, the enterprise may fail and the investment may be lost. This fact distinguishes the cases cited by Ben Shimon in support of her lack of mutuality argument. For example, Ben Shimon cites to <u>Office Pavilion South Florida, Inc. v. Asal Products, Inc.</u>, 849 So. 2d 367 (Fla. 4th DCA 2003), a case involving a dispute between an office goods supplier and a manufacturer of office chairs – a direct seller to buyer transaction, and <u>Allington Towers North, Inc. v. Rubin</u>, 400 So. 2d 86 (Fla. 4th DCA 1981), involving a garden variety purchase and sale contract to convey title to real estate. Unlike these cases, BH 150 promised and delivered to all subscribers, including Ben Shimon, the right to participate in the business venture. Ultimately, the business was successful and those members who fully performed their side of the bargain were rewarded with title to condominium units as a return on their investment. Ben Shimon was not so rewarded only because she did not perform as required under the agreement.

A careful reading of the subscription agreement as a whole also negates Ben Shimon's contention that BH 150 reserved to itself the ability to cancel her subscription at any time at its sole discretion. The language of the agreement Ben

7

Shimon relies on is found in paragraph 4, entitled "Acceptance of Subscription." The first sentence of that paragraph uses the word "reject," rather than "terminate." The sentence is immediately followed by an explanation of what should occur either upon acceptance or rejection of the subscription. Acceptance will be evidenced by a return of the fully signed subscription agreement to the investor, while a refund of any funds received from the investor will follow a rejection. The provision thus refers to BH 150's right to accept or reject Ben Shimon's request to join the business venture. It does not, as Ben Shimon asserts, give BH 150 the unfettered right to terminate Ben Shimon's subscription after her membership in the venture was accepted. The undisputed record shows that BH 150 signed and provided the signed subscription agreement to Ben Shimon, thereby obligating itself to perform under the contract. From this point forward, BH 150 had the right to terminate Ben Shimon's subscription only on grounds expressly stated in the agreement, including failure to pay the full amount of the subscription once the investor received notice of the closing date.

When considering the agreement as a whole, the parties agreed to mutual promises – Ben Shimon agreed to pay a certain amount of money, and in exchange, was to receive an interest in the business venture. Thus, the trial court correctly refused to void the subscription agreement on the ground that it lacked consideration.

2. Penalty clause.

Ben Shimon contends the liquidated damages provision of the subscription agreement should be stricken because it constitutes an impermissible penalty clause. The Florida Supreme Court has adopted this "test as to when a liquidated damages provision will be upheld and not stricken as a penalty clause. First, the damages consequent upon a breach must not be readily ascertainable. Second, the sum stipulated to be forfeited must not be so grossly disproportionate to any damages that might reasonably be expected to follow from a breach as to show that the parties could have intended only to induce full performance, rather than to liquidate their damages." Lefemine v. Baron, 573 So. 2d 326, 328 (Fla. 1991) Again, when properly considered as an agreement to subscribe to a business venture to acquire and convert a building into condominiums, rather than the mere purchase of condominium units, the liquidated damages meets both prongs of this test.

As to the not-readily-ascertainable prong, the Florida Supreme Court has explained that because of fluctuations in the real estate market, damages for the loss of a real estate opportunity cannot be readily ascertained at the time the contract is signed such that it would defeat a liquidated damages clause. See Hutchison v. Tompkins, 259 So. 2d 129, 132 (Fla. 1972) ("The land sale market in Florida fluctuates from year to year and season to season, and it is generally

9

impossible to say at the time a contract for sale is drawn what vendor's loss (if any) will be should the contract be breached by purchaser's failure to close. Accordingly . . . we conclude that the damages which the parties could expect as a result of a breach were not readily ascertainable as of the time the contract was drawn up . . . ."); Bradley v. Sanchez, 943 So. 2d 218, 222 (Fla. 3d DCA 2006) ("The Florida Supreme Court has ruled that liquidated damages are appropriate damages in a contract for sale of real estate in Florida, and they are not to be considered a penalty. Such damages are not readily ascertainable as of the time the contract is drawn." (quotation omitted)). So it was for the subscription agreement in this case, which contemplated an investment in an office building that BH 150 was buying.

As to the grossly-disproportionate prong, Ben Shimon's failure to pay her share of money due for closing jeopardized the entire investment opportunity, not just the purchase of the four units earmarked for Ben Shimon. Her $3,295,000 damages amount is measured against the potential loss of the investment – the office building – which was in excess of $22 million. The approximate 14.97 percent of liquidated damages to the total purchase price of the office building was not grossly disproportionate. See, e.g., Johnson v. Wortzel, 517 So. 2d 42 (Fla. 3d DCA 1987) (18.2%); Dade Nat'l Dev. Corp. v. Southeast Inv. of Palm Beach Cty., 471 So. 2d 113 (Fla. 4th DCA 1985) (18%); Hooper v. Breneman, 417 So. 2d 315

(Fla. 5th DCA 1982) (13.3%).

*Conclusion*

In conclusion, the subscription agreement was neither unenforceable because of lack of mutuality of obligations, nor for an impermissible penalty clause. Accordingly, we agree with the trial court's interpretation of the parties' agreement and affirm the judgment entered below.

Affirmed.