[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-11617

_____

JAMES RIVER INSURANCE COMPANY,
a foreign corporation,

Plaintiff-Appellant,

*versus*

RICH BON CORP.,
a Florida corporation
d.b.a. The Mint Lounge,
MARQUELL SHELLMAN,
an individual,
DAINA HILBERT,
as Personal Representative of the Estate of
David Hilbert,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:16-cv-20273-JEM

_____

Before BRANCH, GRANT, and BRASHER, Circuit Judges.

GRANT, Circuit Judge:

Ordinarily, federal courts have no margin for error on questions of our jurisdiction. But Declaratory Judgment Act cases are different, because that statute vests courts with discretion to say whether declaratory relief is appropriate in the underlying conflict. Here that meant deciding whether the federal suit would interfere with a pending state action.

The district court chose to dismiss the federal case, concluding that it overlapped significantly with the one in state court. But in the process the court overstepped the bounds of its discretion because it fully assessed only one of the claims for declaratory relief, rather than both of them. We therefore vacate and remand.

## I.

Late one Miami summer night at the Mint Lounge, an argument between acquaintances escalated into a shootout. A guest at the nightclub, Marquell Shellman, was shot. So was club employee David Hilbert, who tragically died from his injuries.

The nightclub was insured by James River Insurance Company under a general liability policy, which covered "bodily injury and property damage liability." The policy contained several restrictions on that coverage. To start, it excluded both worker's compensation liability and employee-injury liability. The policy also imposed limits on coverage for bodily injuries "arising out of, resulting from, or in connection with" assault or battery. The limit per occurrence was $25,000, and the aggregate assault-and-battery limit was $50,000.

A few months after the shooting Shellman sued the nightclub in Florida state court, alleging that it was negligent for failing to provide adequate security; a lawsuit from Hilbert's estate was expected too. So to determine the full extent of its liability under the policy, James River filed a federal declaratory judgment action against Mint, Shellman, and Hilbert's estate.

The insurer raised two claims in its complaint. First, it contended that because the nightclub shooting was an assault and battery, the policy limited recovery for any and all injuries to $50,000. Second, it argued that the worker's compensation and employee-injury exclusions barred Hilbert from recovery because he was an employee of the nightclub. The district court stayed the case pending resolution of Shellman's state court suit. Soon after, James River settled the state suit on the nightclub's behalf for $50,000 minus claim expenses and costs—the total amount available under the assault and battery cap.

Ten months later, Hilbert's estate sued the nightclub in Florida state court. One wrinkle for the estate was that the Florida worker's compensation statute generally prohibits employees from bringing tort claims against their employers. *See* Fla. Stat. § 440.11(1). To get around that problem, the estate argued that the nightclub's actions triggered a statutory exception for intentional torts. It alleged that the nightclub had engaged in conduct that it "knew"—based on similar incidents in the past—"was virtually certain to result in injury or death to the employee." *See id.* § 440.11(1)(b).

Both the estate's tort action and James River's federal declaratory judgment action thus required a decision on whether the Florida worker's compensation statute applied to Hilbert. The tort suit, however, did not raise any questions about the insurance policy or its assault and battery limit. In fact, Florida law barred adding James River to that suit. *See id.* § 627.4136.

While its state court suit proceeded, Hilbert's estate moved the federal district court to lift its stay of the declaratory action so that it could dismiss the case altogether. The court lifted the stay, but did not immediately dismiss the case. Meanwhile, James River amended its federal complaint to ask the court to declare not only that the $50,000 assault and battery limit applied, but also that the Shellman settlement had exhausted that coverage. In response, the estate again asked the court to exercise its discretion and dismiss the case in deference to the concurrent state court suit.

The district court considered whether to exercise jurisdiction in two steps. It first asked whether the two suits were parallel enough to compare at all, concluding they were for two reasons: the claims in both cases involved Florida's worker's compensation law, and the defendants in the federal suit were also parties in the state action. It then moved on to consider whether the federalism and comity concerns generated by the declaratory action outweighed the efficiency gains of resolving the claims in federal court, applying the guideposts this Court provided in *Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328 (11th Cir. 2005). Relying primarily on the conflict between one of the federal claims and the state case, the district court dismissed the case. James River appeals.

## II.

When a district court dismisses a declaratory judgment action, we review for abuse of discretion. *Ameritas*, 411 F.3d at 1330. A district court abuses its discretion (1) when it fails to consider a relevant and significant factor; (2) when it gives significant weight to an improper factor; or (3) when it "commits a clear error of judgment" in weighing the proper factors. *Id.* (quotation omitted). A district court also abuses its discretion when it applies "the wrong legal standard." *Id.*

### III.

### A.

When district courts decide whether to proceed with declaratory judgment actions that raise issues also disputed in state court proceedings, they are called to balance conflicting interests— to foster efficient dispute resolution while still preserving the States' interests in resolving issues of state law in their own courts. Discerning "the propriety of declaratory relief" requires "a circumspect sense" of the whole affair. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995) (quotation omitted).

On one hand, a declaratory judgment action is often quite efficient, eliminating delays and uncertainty. It may enable, for example, a prospective defendant to ask the court to declare its "rights and other legal relations," including whether it is liable to a prospective plaintiff for prior or planned future acts. 28 U.S.C. § 2201(a). Without the chance to seek a declaratory judgment, a prospective defendant would often be stuck, waiting out statutes of limitations while watching for lawsuits. *See* 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2751 (4th ed. 2021). That waiting game can impose serious costs, whether financial or personal.

Declaratory actions are especially helpful for third parties— insurance companies in particular. *See, e.g.*, *Travelers Prop. Cas. Co. of Am. v. Moore*, 763 F.3d 1265, 1267 (11th Cir. 2014); *Ameritas*, 411 F.3d at 1329–30; *Admiral Ins. Co. v. Feit Mgmt. Co.*,

321 F.3d 1326, 1327 (11th Cir. 2003).  That is because a tort suit against an insured often generates distinct issues beyond whether the insured is liable for the tort, say, whether the insurer has a duty to defend, or whether the insured's policy covers the liability alleged in the complaint. *See Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941); *Advanced Sys., Inc. v. Gotham Ins. Co.*, 272 So. 3d 523, 527 (Fla. Dist. Ct. App. 2019) (an insurer's duty to defend "is not determined by the insured's actual liability"). When the policy does not cover the liability even if all the facts alleged in the complaint are true, declaratory relief enables the insurance company to avoid the tort suit completely. *Cf. National Trust Ins. Co. v. S. Heating & Cooling, Inc.*, 12 F.4th 1278, 1290 (11th Cir. 2021).  And even when the policy does apply, a declaratory suit allows the insurance company to resolve its liability without waiting for every individual injured party to sue the insured.  Declaratory judgments thus play a valuable role in this context, clarifying insurance companies' liability quickly and directly.

On the other side of the scale are federalism and comity concerns animated by our system of dual sovereignty.  Competing state and federal actions are common. *See, e.g.*, *Wilton*, 515 U.S. at 280; *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 492–94 (1942); *Ameritas*, 411 F.3d at 1329–30.  After all, while the Declaratory Judgment Act enables a prospective defendant to sue in federal court, it does not prevent the party sued from initiating a concurrent state court proceeding. *See* 28 U.S.C. § 2201.  Nor

does anything in the Act prevent a state court defendant from bringing a federal declaratory judgment suit.

What's more, when the issues and parties match, each plaintiff competes to be first to the finish, because whichever case is decided earliest will have preclusive effect on common questions in the other. *See Empire Fire & Marine Ins. Co. v. J. Transp., Inc.*, 880 F.2d 1291, 1296 (11th Cir. 1989) (holding that declaratory judgments trigger collateral estoppel).

Of central concern in this federalism analysis are cases competing to resolve state law issues that "are not foreclosed under the applicable substantive law." *Brillhart*, 316 U.S. at 495. When a federal court decides an unresolved question of state law, issue preclusion prevents the creation of state court precedent on that issue in the companion case. *See, e.g.*, *Mobil Oil Corp. v. Shevin*, 354 So. 2d 372, 374 (Fla. 1977). That, in turn, delays the final resolution of the question as applied to future suits because state supreme courts are the ultimate authority on questions of state law. *See Pincus v. Am. Traffic Sols., Inc.*, 986 F.3d 1305, 1310–11 (11th Cir. 2021). So declaratory judgments have the potential to leave important questions of state law unanswered by state authorities and impede a State's general authority to dispose of state law issues.

These concerns and others need to be balanced with the obvious benefits of declaratory judgments. The Declaratory Judgment Act thus is not a license to supplant state court litigation in every case. If it were, the byproducts—waste, delay, and

needless competition—would mean the Act sometimes did more harm than good. As the Supreme Court cautioned in *Brillhart*, "[g]ratuitous interference with the orderly and comprehensive disposition of a state court litigation should be avoided." 316 U.S. at 495. Nor can the benefits of a declaratory judgment suit be ignored—it is "a remedial arrow in the district court's quiver," fashioned by Congress to provide "a new form of relief" when the need arises. *See Wilton*, 515 U.S. at 288.

That is where the Act's unusual jurisdictional provision comes in. It vests district courts with discretion to dismiss declaratory suits when, in their best judgment, the costs outweigh the benefits. Its language is spare, but direct: federal courts "*may* declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a) (emphasis added). The Act thus makes an explicit "textual commitment to discretion." *Wilton*, 515 U.S. at 286. So while federal courts normally have an "unflagging obligation" to exercise our jurisdiction, where declaratory judgments are concerned this imperative "yields to considerations of practicality and wise judicial administration." *Id.* at 284, 288 (quotation omitted).

Over time, precedents have developed to aid district courts in balancing the interests at stake. In *Ameritas*, this Court provided non-exclusive "guideposts" for district courts to consider when deciding whether to dismiss a federal declaratory judgment action that overlaps with a state case. 411 F.3d at 1331. These factors are intentionally broad, but still offer substantive guidance:

(1) the strength of the state's interest in having the issues raised in the federal declaratory action decided in the state courts;

(2) whether the judgment in the federal declaratory action would settle the controversy;

(3) whether the federal declaratory action would serve a useful purpose in clarifying the legal relations at issue;

(4) whether the declaratory remedy is being used merely for the purpose of "procedural fencing"—that is, to provide an arena for a race for *res judicata* or to achieve a federal hearing in a case otherwise not removable;

(5) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction;

(6) whether there is an alternative remedy that is better or more effective;

(7) whether the underlying factual issues are important to an informed resolution of the case;

(8) whether the state trial court is in a better position to evaluate those factual issues than is the federal court; and

(9) whether there is a close nexus between the underlying factual and legal issues and state law and/or public policy, or whether federal common or

statutory law dictates a resolution of the declaratory judgment action.

*Id.*

As a whole these guideposts account for the federalism and comity concerns generated by competing cases, as well as the comparative utility of the declaratory judgment action. To be sure, courts are not restricted to this set of factors—the list is not "absolute," and no single factor is controlling. *Id.* Indeed, we have characterized the inquiry as a "totality-of-the-circumstances analysis." *National Trust*, 12 F.4th at 1285. So whatever the district court decides to do, it must capture the breadth of the competing interests; without a complete understanding of those interests, it cannot properly balance them.

The question here is whether the court below appropriately followed this process. James River argues that the district court not only weighed the *Ameritas* guideposts incorrectly, but that because the state and federal cases were not truly parallel it never should have applied the guideposts in the first place.

We agree that the district court erred, but not for those reasons. For one, the district court was wrong to assess whether the federal and state cases were "parallel" as a prerequisite to considering the *Ameritas* guideposts. To be fair, that was less clear before our recent decision in *National Trust*. But the court did err in its application of the *Ameritas* factors too. It should not have focused on one of the federal claims almost to the exclusion of the

other—in doing so it failed to properly consider the totality of the circumstances.

## B.

To begin, "the existence of a parallel proceeding is not a prerequisite to a district court's refusal to entertain an action under § 2201(a)," the Declaratory Judgment Act. *National Trust*, 12 F.4th at 1284. Courts possess "unique and substantial discretion" under the Act. *Wilton*, 515 U.S. at 286 (contrasting this discretion with *Colorado River* abstention). And neither our precedents nor the Act itself give specific guidance on what constitutes a "parallel" case—whether the parties must be identical, for example, or whether the claims must overlap completely. That uncertain inquiry finds no home in the analysis.

Consequently, and unlike some abstention doctrines that are more prudential in nature, a parallel proceeding is not a mandatory prerequisite to applying the *Ameritas* guideposts.[1] On this point we have been explicit, albeit after the district court's decision here: the guideposts themselves offer sufficient

---

[1] *Colorado River* abstention, for example, first requires asking whether the cases involve "substantially the same parties and substantially the same issues." *Gold-Fogel v. Fogel*, 16 F.4th 790, 800 (11th Cir. 2021) (quotation omitted). Only then may a court consider several factors to decide whether the circumstances are "exceptional" enough to justify dimissing the "federal suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 818 (1976).

consideration of the challenges relating to concurrent proceedings. *National Trust*, 12 F.4th at 1286.  One area of consideration under *Ameritas*, for example, is whether the federal action would resolve the parties' dispute; that requires discerning whether the same issues and same parties are present in both cases.  Another is whether declaratory relief would create friction between the federal and the state courts; unless the cases implicate the same facts or legal questions, friction is unlikely.  Because the guideposts themselves account for the interests presented by competing state and federal lawsuits, we refuse to impose a duplicative inquiry.

The district court thus erred when it forced James River to clear this extra hurdle.  It should not have grafted "a discrete, parallel-proceeding factor" from abstention doctrine onto the *Ameritas* test.  *Id.* at 1285.  While a concurrent state proceeding is still significant under *Ameritas*, it is not dispositive—in either direction.  *Id.*

## C.

Once the district court moved on from its parallelism analysis, it made another serious misstep: it focused on one of the federal claims almost to the exclusion of the other.  Every claim matters, because *Ameritas* requires a "totality-of-the-circumstances analysis."  *National Trust*, 12 F.4th at 1285.  And a comprehensive analysis is impossible when a court only considers half of the federal claims.  Regardless of the guideposts it applies, a district court must assess the claims raised in a federal declaratory judgment action evenhandedly.

That means a court cannot cherry pick for its *Ameritas* analysis the claims that favor dismissing—or proceeding with—a federal action.  If the court only considers issues raised in both the state and federal cases, it will always underestimate the need to resolve the issues unique to the declaratory action.  And if it only assesses the unique federal claims, the opposite result will follow; the court will underestimate the federalism concerns raised by the overlapping issues.  Both approaches are unreasonable.  Instead, to appropriately assess "the degree of similarity between concurrent state and federal proceedings," a district court needs to look at the cases as a whole.  *See id.* at 1282.

Here, the district court addressed each *Ameritas* guidepost as it analyzed the employee exclusions claim.  It noted the "close nexus" between that claim and "Florida public policy" and relied on the state court's better position to resolve the overlapping factual issues "given its familiarity with" the state tort suit.  The policy limits claim, however, largely received the silent treatment.  The court mentioned that both counts of the federal lawsuit concerned "issues of state law," but said nothing further about the policy limits issue.  That lopsided analysis was unreasonable.

For example, when discussing the fifth guidepost (potential friction between federal and state courts and improper encroachment on state jurisdiction), the district court only said that "[o]verlapping judicial effort is virtually certain to occur."  But that is not a complete analysis, at least for this lawsuit.  Although the claim involving Florida's worker's compensation statute overlaps

with the claims in the state case, the policy limits claim can *only* be resolved in the declaratory judgment action. *See* Fla. Stat. § 627.4136. That's because the state suit is between Hilbert's estate and the nightclub—meaning no insurance policy is directly at issue and James River cannot be added to the case. *Id.* Deciding whether James River has paid in full or still owes the nightclub for future liabilities thus creates no conflict with the state liability case.

Nor was that the only omission. When the court considered the third guidepost (whether the declaratory action would clarify the legal relations at issue), it failed to account for the fact that resolving the policy limits claim could clarify the relationship between James River and the nightclub. And when discussing the fourth and sixth guideposts (whether the declaratory action was merely "procedural fencing" and whether a better alternative remedy existed), the district court again failed to mention that James River was not party to the state suit and that the policy limits claim could only be resolved through the federal declaratory action.

The district court thus overlooked the significant gains in efficiency the declaratory judgment action would generate. These guideposts as applied to the policy limits claim strongly favor allowing the declaratory judgment action to go forward. If the district court had addressed that claim, as it must on remand, it could have included these efficiency interests in the balance against the federalism and comity interests that it did consider. The failure

to do so was a clear error of judgment—and therefore an abuse of discretion.

★        ★        ★

A totality-of-the-circumstances analysis only works when a court considers all of the relevant details.  To do otherwise leaves weights that should be balanced off the scales, or, if used more nefariously, would tip them in favor of a result chosen in advance. We do not suggest that any such artifice happened here.  But we do think that the district court, by failing to consider the policy limits claim, missed the efficiency gains that it needed to balance against federalism and comity interests before deciding whether to proceed with the declaratory judgment action.  We therefore **VACATE** the judgment and **REMAND** the case for further proceedings consistent with this opinion.

20-11617            BRASHER, J., Concurring            1

BRASHER, Circuit Judge, Concurring:

I concur in full in the Court's opinion. As I said in my concurring opinion in *National Trust Ins. Co. v. S. Heating & Cooling, Inc.*, 12 F.4th 1278 (11th Cir. 2021), insurers reasonably expect the federal courts to resolve run-of-the-mill disputes about their duties to defend and indemnify against claims made in an underlying tort action. In fact, allowing "a declaratory action by an insurer to establish nonliability under casualty insurance was one of the prime purposes of the Declaratory Judgment Act." *W. Cas. & Sur. Co. v. Teel*, 391 F.2d 764, 766 (10th Cir. 1968).

In deciding whether to decline jurisdiction in a case like this one, I don't think district courts should fixate on whether a related action is pending *because one almost always is*. Whenever a liability insurer sues its insured for a declaration of its duties to defend and indemnify (or vice versa), there will be a pending or threatened related lawsuit—often in state court—between the insured and a third party. After all, if a third party had not sued or threatened to sue the insured, then the liability insurer would not be asking for a declaratory judgment about its duties to defend and indemnify against that claim. Accordingly, the mere pendency or threat of such a related action is no justification for a district court to decline to adjudicate a federal lawsuit between an insurer and its insured.

In weighing the *Ameritas* factors in a dispute between a liability insurer and its insured, *see Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1331 (11th Cir. 2005), I suggest district

courts focus on whether there is anything unique or extraordinary that differentiates their case from the mine run of liability insurance disputes. For example, one could ask: Does the State have a stronger interest in deciding this particular state-law issue in state court than it normally would in a state-law liability insurance dispute? Is there a state-specific public policy at play that is not present in most other insurance disputes? Is there some important factual dispute in the state litigation that would be unusually dispositive in the declaratory judgment action? We answered these questions in the affirmative in *National Trust*, where coverage first turned on an open question of state law that had split state courts (whether carbon monoxide was a "pollutant" under the policy's pollution exclusion) and then on a difficult fact question that was being litigated in the underlying tort action (whether the fire that harmed the third parties was burning outside of its intended location, potentially triggering a "hostile fire" exception to the pollution exclusion).

But, as the Court's opinion suggests, there is nothing special about this case that warrants declining jurisdiction. Far from it. The district court can resolve this dispute by interpreting the terms of the insurance contract—specifically, the policy's bodily injury limits, a worker's compensation exclusion, and an employer liability exclusion, which are all common features of commercial insurance policies. Federal courts routinely answer questions like these. *See, e.g.*, *Endurance Am. Specialty Ins. Co. v. United Constr. Eng'g, Inc.*, 343 F. Supp. 3d 1274, 1280, 1287–88 (S.D. Fla. 2018),

20-11617            BRASHER, J., Concurring            3

*aff'd*, 786 F. App'x 195 (11th Cir. 2019) (employer's liability exclusion and worker's compensation exclusion); *Scottsdale Ins. Co. v. GFM Operations, Inc.*, 789 F. Supp. 2d 1278, 1287–88 (S.D. Fla. 2011) (same). If the *Ameritas* factors weighed against exercising jurisdiction here, then they would justify that result in almost any liability-insurance-related declaratory judgment action. Accordingly, it was an abuse of discretion for the district court to decline to exercise jurisdiction.